UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
KTB OIL CORPORATION,

                      Plaintiff,                   Case No. 08 Civ 00584 (LAP)

    - against -

ORAM TANKER LTD.                        **DECLARATION OF**

                    Defendant.
----------------------------------------------------x

I, ROBERTO DIP, declare as follows:

1.      I am an employee of Bauche Energy S.A. ("Bauche Energy"). I submit this declaration in support of the application of Bauche Energy for an Order vacating the attachment of funds which are being held by BNP Paribas SA New York due to an Order of Attachment in this action dated January 24, 2008. I have handled the chartering arrangements described below and I am personally familiar with the facts contained herein.

2.      Bauche Energy is the charterer of the vessel M/T ORAM BLOSSOM OOS (the "Vessel"), pursuant to a tanker voyage charter party dated May 30, 2008 (the "Charter Party") between Bauche Energy and Oram Marine Co., Ltd. as time chartered owner. A copy of the Charter Party is attached hereto as Exhibit 1.

3.      The Charter Party covers the carriage by Oram Marine for Bauche Energy of a cargo of ethanol from Karachi, Pakistan to Ulsan, South Korea. We at Bauche Energy sold the cargo to important customers in Korea. It is currently aboard the Vessel enroute to Ulsan and is expected to arrive at that port on July 1, 2008, Korean time, which would be sometime on Monday, June 30, 2008, in New York.

4.     Under Clause 24 of the Bauche Energy Terms and Conditions which are part of the Charter Party, Bauche Energy was required to pay freight for the voyage in US dollars into Oram Marine's "designated bank account" within three working days after the signing and releasing of Bills of Lading for the cargo.

5.     Bills of lading for the cargo were issued on June 8, 2008.  On June 9, 2008 Oram Marine issued a freight invoice to Bauche Energy and sent it to the chartering brokers, Pole Shipping S.A.  (A copy of Oram Marine's freight invoice is attached hereto as Exhibit 2.)  The freight invoice instructed Bauche Energy to remit freight in the amount of $211,402.44 into Korea Exchange Bank, Account No. 650-006485-917 for the benefit ("in favor") of Oram Marine.

6.     Per their usual practice, the brokers issued two invoices, one to Bauche Energy for the net freight due, after deduction of broker's commission, and one for their commission. Under "Remittance details," the freight invoice designated the correct beneficiary and correct account number.  The broker's freight invoice repeated the same instruction for Bauche Energy to remit freight (this time, in the net amount of $206,117.38) into the Korea Exchange Bank, Account No. 650-006485-917 for "in favor of Oram Marine Co. Ltd."  However, at the top of the invoice the brokers mistakenly referred to "Oram Tankers," so Pole Shipping sent corrected invoices. (Copies of Pole Shipping's freight and commissions invoices are attached hereto as Exhibit 3).

7.     On June 12, 2008, the remittance department of Bauche Energy instructed BNP Paribas (Suisse) SA to transmit the freight in the amount of $206,117,38 to the same account no.650006485917 at Korea Exchange Bank.

8.     Our remittance department mistakenly referred to "Oram Tankers Ltd."

instead of Oram Marine.  This error was then reflected in the swift message with payment

details sent by Bauche's bank, BNP Paribas (Suisse) SA, on June 12, 2008 to Korea

Exchange Bank which references as the "beneficiary" the bank account 650006485917,

which is the correct account of Oram Marine, but mistakenly names "Oram Tankers Ltd."

instead of Oram Marine. (A copy of the swift message is annexed hereto as Exhibit 4.)

9.     On the morning of June 13, 2008, the brokers, Pole Shipping, relayed a

message from Oram Marine that the funds had been received but could not be drawn

from its account with Korea Exchange Bank because the beneficiary's name was wrongly

stated as "Oram Tankers Ltd."  At this point, we realized our mistake and I immediately

advised BNP Paribas (Suisse) SA that the name of the beneficiary should be corrected to

Oram Marine Co., Ltd. (Copies of Pole Shipping's email to Bauche Energy and my email

to BNP Paribas (Suisse) SA are annexed hereto as Exhibit 5.)  This instruction was sent

before we learned of the attachment.

10.     Later the same morning, we learned for the first time that the BNP Paribas

SA, New York was holding the funds pursuant to a process of maritime attachment and

garnishment, which BNP advised had been served on June 12, 2008. (See email to me

from BNP Paribas (Suisse) SA forwarding an email from BNP Paribas SA New York to

BNP Paribas (Suisse) SA, a copy of which is annexed hereto as Exhibit 6).

11.     Bauche Energy had transacted business on one occasion in the past with

Oram Tanker Ltd., the defendant in this action, but this involved a different ship, the MT

ZHONG HUA and we paid freight to a different account at HANA Bank.  (Pole

Shipping's freight invoice is Exhibit 7.)  This is probably why our remittance department

made the mistake of naming "Oram Tankers Ltd." as the beneficiary. This incorrect name may have been in our payment system. I do not know if there is any company named "Oram Tankers Ltd." I do know that Oram Marine Co. Ltd. (*not* Oram Tanker Ltd. nor Oram *Tankers*) was our contract partner in this transaction and that we made the remittance to the bank account of Oram Marine, which fully complied with our contractual obligation to pay freight to Oram Marine, Co. Ltd.'s "designated bank account" under the terms of the Charter Party.

12.     Bauche Energy had nothing to do with any disputes or claims that KTB Oil may have against Oram Tanker Ltd. We have always performed in good faith, but Oram Marine has advised us that if the freight problem is not resolved by the time that the Vessel arrives at the discharge port of Ulsan (present ETA: Monday , June 30, 2008 New York Time), it will exercise a maritime lien on the cargo for the freight and will not deliver the cargo to our customer. Such an action would cause Bauche Energy to incur significant damages and threatens to irreparably harm our relations with a very important customer, which might claim against us for any market loss, even if it accepts late delivery. If the customer rejected the cargo, which is worth $1,482,543 Bauche Energy would be exposed to the risk of substantial market loss, as well as the cost of trying to re-sell and re-transport what new buyers would know to be a distressed cargo.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed at Nyon, Switzerland, on June 29, 2008.

# ROBERTO DIP DECL.


# EXHIBIT 1





Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

GENEVA, 30th MAY 2008 /BC
Place                              Date

IT IS THIS DAY AGREED between **ORAM MARINE CO., LTD AS TIME CHARTERED OWNER**
~~chartered owner/owner~~ (hereinafter called the "Owner") of the **SINGAPORE FLAG**
~~SS/MS~~ **M/T ORAM BLOSSOM OOS** (hereinafter called the "Vessel")
and **BAUCHE ENERGY SA** (hereinafter called the "Charterer")
that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party,
which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over
those contained in Part II.

### PART I

A.    Description and Position of Vessel: **Q88 ATTACHED**

      Deadweight: _____ tons (2240 lbs.)    Classed: _____
      Loaded draft of Vessel on assigned summer freeboard _____ ft. _____ in. in salt water.
      Capacity for cargo: _____ tons (of 2240 lbs. each) _____ % more or less, Vessel's option.
      Coated:                 [ ] Yes        [ ] No
      Coiled:                 [ ] Yes        [ ] No                    Last ~~two~~ 3 ( THREE )cargoes: 1ST
LAST: **METHANOL; 2ND LAST: VIRGIN TANK a/o TOLUENE; 3RD LAST: VIRGIN TANK.**
      Now: **TRADING**  Expected Ready:

B.    Laydays:

      Commencing: **04TH JUNE 2008** Cancelling: **10TH JUNE 2008.**

C.    Loading Port(s): **ONE SAFE BERTH KARACHI.**

      ~~Charterer's Option~~

D.    Discharging Port(s): **ONE SAFE BERTH ULSAN.**

      ~~Charterer's Option~~

E.    **PART Cargo: 2'350 MTS, 1 GRADE POTABLE ETHANOL IN BULK, 5% MORE OR LESS IN CHARTERERS' OPTION.**

      ~~Charterer's Option~~

F.    Freight Rate: **USD 90.- per ton** ~~(of 2240 lbs. each).~~

G.    Freight Payable to: **3 WORKING DAYS AFTER SIGNING/RELEASING OF CLEAN ON BOARD BILLS OF LADING, MARKED FREIGHT PAYABLE AS PER C/P.** at

H.    ~~Total Laytime in Running Hours:~~ **125/150 MTPH, LOAD/DISCHARGE, SHINC REVERSIBLE.**

I.    Demurrage per day: **USD 12'000.-  PRO RATA**

J.    Commission of **2.5 %** is payable by Owner to **POLE SHIPPING SA** on the actual amount freight,
      **DEADFREIGHT AND DEMURRAGE** when as freight is paid **AND DEDUCTABLE FROM.**

K.     The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.     Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.     Special Provisions:

**M1. CHARTERERS' TERMS, 1 TO 28, AS ATTACHED.**

**M2. OWNERS' AGENTS AT BOTH ENDS**

**M3. SURVEYORS TO BE ARRANGED BY CHARTERERS AT THEIR OWN ACCOUNT.**

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of: **THE OWNERS**

By: _____

Witness the signature of: **THE CHARTERERS**

By: _____
Ricardo Parada Pimenta
BAUCHE ENERGY SA
6 Avenue Reverdil

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

## PART II

1.      WARRANTY - VOYAGE - CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat), from the factors of the Charter a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2.      FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3.      DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4.      NAMING LOADING AND DISCHARGE PORTS.
        (a)     The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

        On a voyage to a port or ports in:
ST.KITTS                Carribean or U.S.   Gulf loading port(s)
PORT SAID               Eastern Mediterranean or Persian Gulf loading port(s)
                        (from ports west of Port Said.)

        (b)     If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:
Place                   On a voyage to a port or ports in:
LAND'S END              United Kingdom/Continent (Bordeaux/Hamburg range)
                        or Scandinavia (including Denmark)
SUEZ                    Mediterranean (from Persian Gulf)
GIBRALTAR               Mediterranean (from Western Hemisphere).
        (c)     Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used Laytime.

5.      LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6.      NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice or readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7.      HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8.      DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9.      SAFE BERTHING - SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10(     PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11.    HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12.    DUES - TAXES - WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13.    (a).    CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

        (b)    FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14.    (a).    ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

        (b)    If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.    TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

        (a)    Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

        (b)    All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

        (c)    Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

        (d)    Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.    GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or ICE or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17.    (a).    QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

        (b)    FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.    CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.    GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, standing or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure inperforming hereunder, arising or resulting from:- Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process providedbond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20.    ISSUANCE AND TERMS OF BILLS OF LADING.

(a)    The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b)    The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i)    CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation: The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its

rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii)     JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii)     GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 1994 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv)     BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v)     LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi)     WAR RISKS.     (a)     If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b)     If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c)     The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien

(vii)     DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.     LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22.     AGENTS. The Owner shall appoint Vessel's agents at all ports.

23.     BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24.     ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the

same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25.        SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26.        OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

BILL OF LADING

Shipped in apparent good order and condition by _____

on board the _____ Steamship/Motorship _____

whereof _____ is Master, at the port of _____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London _____

between _____ and _____, as Charterer, and all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____


_____

Master


This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

## BAUCHE ENERGY TERMS AND CONDITIONS (CL 1 TO 28)

1:  It is understood and agreed by all parties that this fixture shall be kept private and confidential and shall not be reported.

2.  Owners warrant that they are a member of the International Tanker Owners Pollution Federation Limited (ITOPF) and will remain so during the performance of this Charter and entered in a P. & I. Club being a member of the 'I.A.C.S.' and that the Owners are insured against oil-pollution at the maximum available cover i.e. presently USDOLLARS one billion.

3.  Certification/restrictions/conditions:

    3.1. At all times, vessel is to have on board all the necessary valid international and/or local certificates required for the loading, transportation and discharge of the cargo under this C./P., including but not limited to the I.S.M. D.O.C. (Document of Compliance), S.M.C. (Safety Management Certificate). and Ballast Water Management Plan. Any delay and/or other consequences resulting from non-compliance to be fully for Owners' time and/or account.

    3.2. Vessel to comply with all port restrictions and maritime conditions applicable at the loading and/or discharging port(s) and berth(s). any delay and/or other consequences resulting from non-compliance to be fully for Owners' time and/or account

4.  Stowage/3 last cargoes to be subject to Charterers' and Receivers' approval. Charterers to have at least 2 (two) working days to accept stowage/3 last cargoes.

5.  10/7/5/3/2/1 days hrs ETA notices at all ports including rotation/schedule.

6.  Owners to clean all vessel's tanks, lines and pumps to Charterers inspectors' satisfaction. Tanks to be tested by visual, odour, Tyndall, PTT, UV and GLC or any other test Charterers or their nominated Surveyors find necessary to ascertain the safe loading of the cargo on board the vessel. First inspection to be for Charterers' account and any additional to be for Owners' account. All and any inspection always to be carried out at loading berth and never at previous berth(s), anchorage or roads, unless specifically agreed in writing. Charterers shall declare the tests to be performed in each tank upon being notified by Receivers of the approval of stow and last cargoes.

7.  Any waiting time for free berth to be prorated among those Charterers loading and/or discharging at the same berth.

8.  NOR not to be tendered prior to commencement of laycan unless agreed to by Charterers.

9.  To be valid, NOR to be re-tendered in the event vessel or her tanks/lines/pumps is/are not approved for loading.

10. All exceptions to laytime, even if all laytime has expired. For example, Charterers shall have six (6) hours notice each port and any shifting time never to count as used laytime/demurrage time. Time shall not count against laytime or, if the vessel is on demurrage, for demurrage, when spent or lost :

10.1. on an inward passage, including a waiting tide, pilot or tugs and moving from anchorage, even if lightening has taken place at the anchorage, until the vessel is securely moored at the berth or other loading or discharging place specified by Charterers

10.2. due to breakdown, inefficiency or other cause attributable to the vessel and or owners including inability of the vessel to pump out the cargo after taking account of any variations in specific gravity or back pressure :

10.3. as the result of a labour dispute, or strike, involving master, officers or crew of the vessel or tugs or pilots :

10.4. in handling ballast unless this is carried out concurrent with loading/discharging such that no loss of time is involved, or is carried out to comply with a shore restriction.

10.5. In handling/taking bunkers.

11. York/Antwerp 1994 rules.

12. GA/Arbitration - ~~NYK/US~~ **LONDON, English** law to apply.

13. All taxes and/or dues, including those on freight - except in case of Pakistan loading where freight tax and West Africa where OGEFREM are for Owners' account - plus any brokerage fees on remittances abroad, Brazilian Port Utilization Tax or Port Infra-Structure tax or similar, Marine Renewal Tax and Consular fees, to be for Charterers' account.

14. Rotation/Completion/Segregation clauses. Owners to have the liberty to complete with other cargo(es) for their account, at port or ports, rotation of ports at Owners' option. Provided en route and geographical. Owners to undertake to keep the cargo(es) completely segregated from other cargo(es) onboard the vessel.

15. ~~Should Charterers need, two or more parcels and/or any denaturant(s) and/or water to be blended onboard the performing vessel as per Charterers' instructions and under Charterers' surveyors' supervision. In this case, Owners not to be responsible for any change on the specifications caused by or as a result of such blending but, once final blending is accomplished and final results are found by surveyors, Owners to remain responsible thereafter for any change in such specifications. In such case also, if necessary and as per Charterers' request, Owners shall re-issue original "Clean onboard" Bs/L to reflect the final blended product onboard. The release of these new originals to be against the return of the first full set of originals issued.~~ **NOT APPLICABLE**

16. In case Original Bills of Lading have not yet arrived/are not available at discharge port(s), Owners to discharge against LOI issued by Charterers as per Owners' P&I wording and without bank guarantee or counter-signature.

17. ~~Verification of Certificate of Competence of crew members and Classification Society by Brazilian Authorities:~~

~~For clearance purposes of National and Foreign vessels engaged in either coastwise or foreign trade, qualification certificates of crew must be checked in the light of their activities onboard. In accordance with what is established in the Safety Training and Crew Watch Convention STCW 78, lack of presentation of evidentiary qualification certificates for such personnel obliges Ship Owners or Operators to arrange the substitution of the crew involved by others~~

~~whom are duly qualified. Vessels with Captain and/or crew members found to be in~~
~~disagreement with the above conditions shall be impeded from operating in Brazilian ports~~
~~and shall, consequently, not be given clearance. The aforementioned documents together with~~
~~all the documents which are issued by the Class Bureau must be presented in it's original form~~
~~or in Xerox which are authenticated by Captain in command of the vessel.~~ **NOT**
**APPLICABLE**

18. Owners to submit any demurrage claim together with supporting documents within 90
(ninety) days after completion of discharge otherwise claim is considered waived. In no
event, on a reversible laytime situation, Charterers shall be obliged to pay demurrage before
voyage end and cargo is discharged at destination port (s) . In case demurrage is caused or is a
direct or indirect consequence of acts of Port Authority (such as interdiction of berths or
access channels for dredging or other reasons) demurrage to count as half rate.

19. No transhipment or partial shipment allowed unless specifically agreed in writing with
Charterers

20. "Clean onboard" Bills of Lading to be released one working day after completion loading
marked "Freight payable as per Charter-Party"

21. In the event that the Vessel enter War Zones or areas where the Owners' Underwriters require
War Risk Insurances and/or the Owners become obliged to pay the crew War Risk Bonuses,
such expenses shall be for Charterers' account.

Remarks: Please note the understanding is, if vessel has to enter in a so declared war risk zone
because of specific cargo, then only this cargo is to be liable for the increased costs that may arise
due to war risk. However, if a certain zone which is in the vessel's route is declared as war risk
zone during vessel's voyage, and if vessel can not avoid such zone, thane all cargoes on board are
liable.

22 Ship to be max 25 years old and any overage insurance premium between 20 and 25 years to
be for Owners' account.

23. Owners' MARPOL Clause to apply.

24. Freight payable in USDOLLARS to Owners' designated bank account, **3 (THREE)** working
days after signing/releasing of "Clean onboard" Bills of Lading marked "Freight payable as
per C/P", discount less and non-returnable, ship and/or cargo lost or not lost.

25. Any berth dues such as dockage, wharfage or similar charges incurred at loading and/or
discharging ports shall be presented to Charterer for settlement latest 90 (ninety) days after
completion of discharge otherwise it will be considered waived.

26. Charterers will appoint their Protective Agents at load and/or discharge ports, to whom
Owners commit to maintain fully informed and updated on the same basis as Owners' agents
including applicable NOR tendering.

27. CONOCO WEATHER CLAUSE
Delays in berthing for loading or discharging and any delays after berthing which are due to
weather conditions shall count as one half laytime or if on demurrage as one half demurrage
rate.

28. BIMCO ISPS Clause

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account and in no event shall any such delay count as laytime or demurrage.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require reasonably to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code, provided that the vessel is in all respect an arrived ship.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence or under ( c ) above. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

QUESTIONNAIRE 88 (Version 2)

**INTERTANKO'S STANDARD TANKER VOYAGE CHARTERING QUESTIONNAIRE 1988 (Version 2)**
*(Metric system to be applied, HVPQ reference specified where applicable)*

| GENERAL INFORMATION | | HVPQ Ref |
|---|---|---|
| Date Updated: | 29th April 08 | |
| Vessel's name: | ORAM BLOSSOM | 1.2 |
| IMO number: | 9449558 | 1.3 |
| Vessel's previous name(s): | NA | 1.4-1.7 |
| Flag: | SINGAPORE | 1.8 |
| Port of Registry: | SINGAPORE | 1.9 |
| Call sign: | 9VCL4 | 1.11 |
| Inmarsat phone number: | 761146727 | 1.12 |
| Fax number: | 761146729 | 1.13 |
| Email address: | oramblossom@honglam.com.sg | 1.16 |
| Type of vessel: | OIL/CHEMICAL TANKER IMO II | 1.17 |
| Type of hull: | Double hull | 1.19 |

| OWNERSHIP & OPERATION | | |
|---|---|---|
| Registered owner - Full Style: | HL Paragon Tankers Pte Ltd<br>135 Cecil Street, #08-01<br>Singapore 069536<br>Office tel. no. +65-63336577<br>Office fax no. +65-63336077<br>Office e-mail honglam@honglam.com.sg | 1.20 |
| Technical operator - Full Style: | Hong Lam Marine Pte Ltd<br>135 Cecil Street, #08-01<br>Singapore 069536<br>Office tel. no. +65-63336577<br>Office telex no.N.A<br>Office fax no. +65-63336077<br>Office e-mail honglam@honglam.com.sg | 1.22 |
| Commercial operator - Full Style: | Oram Tanker Ltd<br>Leema Bldg, # 146-1 Susong-Dong, Jongro-Gu<br>Seoul, Korea<br>Office tel.no. +82-2 398 5988<br>Office telex no. N.A.<br>Office fax no.+82-2 398 5969<br>Office e-mail oram@oramtanker.com | 1.25 |
| Disponent owner / Bareboat charterer - Full Style: | N.A. | |
| Number of vessels in Disponent owner's fleet:: | - | |

| BUILDER | | |
|---|---|---|
| Where Built : | PR China | 1.26 |
| Date Delivered: | 18th Apr' 2008 | 1.31 |

| CLASSIFICATION | | |
|---|---|---|
| Vessel's classification society: | Bureau Veritas | 1.34 |
| Class notation: | HULLOIL/CHEMICAL TANKER ESP,IMO TYPE II | 1.35 |
| If Classification society changed, name of previous society? | N.A | 1.36 |
| If Classification society changed, date of change? | N.A | 1.37 |
| Last dry-dock: | New ship | 1.38 |



| | | | |
|---|---|---|---|
| Last special survey: | | New ship | 1.41 |
| Latest CAP Rating (if applicable) | | N.A | 1.44 |
| Last annual survey: | | New ship | 1.45 |
| Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS)? | | Yes  No   N.A | |

**DIMENSIONS**

| | | |
|---|---|---|
| LOA (Length Over All): | 114.90 Meters | 1.49 |
| Extreme breadth: | 18.60 Meters | 1.51 |
| KTM (Keel to Masthead): | 37.00Meters | 1.54 |
| BCM (Bow to Center Manifold): | 58.79 Meters | 1.57.1 |
| Lightship parallel body length: | 33.04 Meters | 1.57.3 |
| Normal ballast parallel body length: | 47.80 Meters | 1.57.6 |
| Parallel body length at Summer DWT: | 56.28 Meters | 1.57.9 |

**TONNAGES**

| | | |
|---|---|---|
| Net Tonnage: | 2916.00 | 1.59 |
| Gross Tonnage: | 6389.00 | 1.60 |
| Suez Net Tonnage: | 5361.78 | 1.61 |
| Panama Net Tonnage: | N.A | 1.62 |

| LOADLINE INFORMATION | Freeboard (Metres) | Draft (Metres) | Deadweight (Tonnes) | Displacement (Tonnes) | |
|---|---|---|---|---|---|
| Summer: | 2.812 | 8.00 | 9259.0 | 12534.3 | 1.63 |
| Winter: | 2.979 | 7.833 | 8916.8 | 12216.8 | 1.64 |
| Tropical: | 2.645 | 8.167 | 9553.9 | 12853.9 | 1.65 |
| Lightship: | 7.612 | 3.20 | 0 | 3310 | 1.66 |
| Normal Ballast Condition: | 5.512 | 5.30 | 4416.1 | 7716.1 | 1.67 |

| | | |
|---|---|---|
| TPC on summer draft: | 19.1 t/cm | 1.70 |
| Does vessel have Multiple SDWT? | Yes  No | 1.72 |
| If yes what is the maximum assigned Deadweight? | N.A | 1.73 |
| Air draft (sea level to top of mast/highest point) in normal SBT condition? | 31.5 Meters | 1.74 |

**RECENT OPERATIONAL HISTORY**

| | | |
|---|---|---|
| Has vessel been involved in any collision, grounding or pollution incident the past 12 months, full description: | No | 1.77-1.79 |

**CERTIFICATION**

| Owners warrant following certificates to be valid throughout the Charter Party period: | | |
|---|---|---|
| SOLAS Safety Equipment: | 14th September 2008 | 2.2 |
| SOLAS Safety Radio: | 14th September 2008 | 2.3 |
| SOLAS Safety Construction: | 14th September 2008 | 2.4 |
| Load line: | 14th September 2008 | 2.5 |
| IOPPC: | 14th September 2008 | 2.6 |
| Safety Management (ISM): | 15th October 2008 | 2.8 |
| USCG COC: | NA | 2.11 |
| CLC( 1992) | 20th February 2009 | 2.13 |
| US COFR: | NA | 2.15 |
| Certificate of Fitness (Gas/Chemicals): | 14th September 2008 | 2.16 & 2.17 |
| Certificate of Class: | 14th October 2008 | |
| ISPS ISSC: | 15th October 2008 | |

**DOCUMENTATION**

| Does the vessel have the following documents on board? | | |
|---|---|---|
| International Safety Guide for Oil Tankers & Terminals (ISGOTT): | Yes  No | 2.28 |
| OCIMF/ICS Ship to Ship Transfer Guide (Petroleum): | Yes  No | 2.31 |
| Is the vessel entered with ITOPF? | Yes  No | |

**CREW MANAGEMENT**

| | | |
|---|---|---|
| Nationality of Master | Korea | |

| | | |
|---|---|---|
| Nationality of Officers: | Korea/ Myanmar | 3.1 |
| Nationality of Crew: | Myanmar | 3.2 |
| If Officers/Crew employed by a Manning Agency - Full Style: | No | 3.1 & 3.2 |
| What is the common working language onboard? | English | 3.1 |
| Do key officers understand English? | Yes   No | |
| In case of Flag Of Convenience (FOC), is the ITF Special Agreement on board? | Yes   N.A | |

| STRUCTURAL CONDITION | | |
|---|---|---|
| Are cargo tanks coated? | Yes | 7.1 |
| If Yes, specify type of coating: | Marineline | 7.1.1 |
| If cargo tanks are coated, specify to what extent: | Whole Tank | 7.1.3 |
| Are slop tanks coated? | Yes | |
| If slop tanks are coated, specify to what extent: | Whole Tank | |

| CARGO & BALLAST SYSTEMS | | |
|---|---|---|
| If double hull, is vessel fitted with centreline bulkhead in all cargo tanks? | Yes | 8.2 |
| Groups / Tank Capacities , wings ( P & S ) combined @100% | 1.  1,133.751 m³<br>2.  1,640.169 m³<br>3.  2,089.682 m³<br>4.  2,107.790 m³<br>5.  2,101.909 m³<br>6.  1,053.384 m³<br>    10,126.685 m³<br>Slop 492.819 m³ | 8.3 |
| Total cubic capacity 98% ex slop tank: | 9,924.151 m³ | 8.4 & 8.6 |
| Slop tank(s) capacity 98%: | 482.983 m³ | 8.5 & 8.7 |
| SBT or CBT† | 4,129.10 | |
| If SBT, what percentage of SDWT can vessel maintain with SBT only? | 47.8% | 8.14.2 |
| If SBT, does vessel meet the requirements of MARPOL Reg 13(2)? | Yes | 8.14.3 |
| Number of natural segregations with double valve: | 14 | 8.15 |

| CARGO PUMPS | | |
|---|---|---|
| Type: | Framo Pump(Deep well) | 8.18-8.25 |
| Number: | 14 | 8.18-8.25 |
| Capacity: | 300 m³×8<br>200 m³×4<br>100 m³×2 | 8.18-8.25 |

| GAUGING AND SAMPLING | | |
|---|---|---|
| Can tank innage/ullage be read from the CCR? | Yes   No | 8.48 |
| Can vessel operate under closed conditions in accordance with ISGOTT 7.6.3? | Yes   No | 8.51 |
| Type of tank gauging system (radar / floating / other) | RADAR | 8.51.1 |
| Are high level alarms fitted and operational in cargo tanks? | Yes | 8.54 |

| VAPOUR EMISSION CONTROL AND VENTING | | |
|---|---|---|
| Is a vapour return system fitted? | Yes | 8.65 |
| State what type of venting system is fitted: | Independent High velocity | 8.67 |
| Max loading rate per midships connection for homogenous cargo? | 1,000 Cu.Meters | 8.79 |

| CARGO MANIFOLDS | | |
|---|---|---|
| Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes   No | 8.80 |
| What is the number of cargo connections per side? | 13 | 8.83 |
| What is the size of cargo connections? | 150mm,125mm,100mm | 8.84 |
| What is the material of the manifold? | Stainless steel | 8.86 |
| Distance between cargo manifold centres: | 520 Millimetres | 8.93 |
| Distance ships rail to manifold: | 5510 Millimetres | 8.95 |
| Distance main deck to centre of manifold: | 2040 Millimetres | 8.97 |
| Height of manifold connections above the waterline | 4.84 Metres | 8.101 |

| | | |
|---|---|---|
| at loaded (Summer Deadweight) condition? | | |
| Height of manifold connections above the waterline in normal ballast? | 7.54 Metres | 8.102 |
| Is vessel fitted with a stern manifold? | Yes  No | 8.104 |
| Number / size reducers: | 5×6  2PCS | |
| | 6×8  2PCS | |
| | 10×6  2PCS | 8.106-8.110 |
| | 8×10  1PCS | |
| | 8×12  1PCS | |

### CARGO HEATING

| | | |
|---|---|---|
| Type of cargo heating system? | FRAMO deck heater (steam) | 8.120 |
| Material of heating system? | Stainless steel 316L | 8.128 |
| Max load temp: | 60 deg Celsius | |
| Max temp maintain: | 70 deg Celsius | |

### IGS & COW

| | | |
|---|---|---|
| Is an Inert Gas System (IGS) fitted? | Yes  No | 9.1 |
| Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | Nitrogen bottles | 9.3 |
| Is a Crude Oil Washing (COW) installation fitted? | Yes  No | 9.17 |

### MOORING ARRANGEMENTS

| | | |
|---|---|---|
| Number / length / diameter / breaking strength of wires: | | |
| Focsle: | | 10.2 |
| Main deck fwd: | | 10.3 |
| Main deck aft: | | 10.4 |
| Poop: | | 10.5 |
| Number / length / diameter / breaking strength of ropes: | On Drums | |
| Focsle: | 04 / 200M / 60 mm / 492.0KN | 10.11 |
| Main deck fwd: | 00 | 10.12 |
| Main deck aft: | 00 | 10.13 |
| Poop: | 04 /200M / 60 mm / 492.0KN | 10.14 |
| | Other Lines | |
| Focsle: | 3 / 200M / 60 mm / 492.0KN | 10.15 |
| Main deck fwd: | 00 | 10.16 |
| Main deck aft: | 00 | 10.17 |
| Poop: | 2 / 200M / 60 mm / 492.0KN | 10.18 |
| Number and brake holding power of winches: | | |
| Focsle: | 2 / 26 Tonnes | 10.22 |
| Main deck fwd: | 00 | 10.23 |
| Main deck aft: | 00 | 10.24 |
| Poop: | 2/ 26 Tonnes | 10.25 |
| How many closed chocks and/or fairleads of enclosed type are fitted on: | | |
| Focsle: | 5 Nos. / 6nos. | |
| Main deck fwd: | 2 Nos. / Nil | |
| Main deck mild: | 2Nos/Nil | |
| Main deck aft: | 2 Nos. / Nil | |
| Poop: | 2Nos. / 12nos. | |

### SINGLE POINT MOORING (SPM) EQUIPMENT

| | | |
|---|---|---|
| Fairlead size: | Millimetres | 10.48 |
| Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | Yes  No | 10.60 |
| Is vessel fitted with chain stopper(s)? | Yes  No | 10.61 |
| Number: | N.A | 10.61.1 |
| Type: | N.A | 10.61.2 |
| SWL: | N.A | 10.61.3 |
| Max diameter chain size: | Millimetres | 10.62 |

### LIFTING EQUIPMENT

| Derrick(s) - Number / SWL: | N.A | 10.75 |
| Crane(s) - Number / SWL: | 01 / 2.0Tonnes | 10.76 |
| **ENGINE ROOM** | | |
| What type of fuel is used for main propulsion? | MGO/HFO | 12.5 |
| What type of fuel is used in the generating plant? | MGO/HFO | 12.14 |
| **MISCELLANOUS** | | |
| P & I Club name: | Standard | |
| Last three cargoes (Last / 2nd Last / 3rd Last): | New Ship, Virgin Tanks | |
| Last three charterers (Last / 2nd Last / 3rd Last): | New Ship | |
| Last three voyages (Last / 2nd Last / 3rd Last): | New Ship, Maiden voyage | |
| Date of last SIRE Inspection: | New Ship | |
| Date of last CDI Inspection: | N.A | |
| Current Oil Major Company Acceptances (TBOOK): | None | |
| Date and place of last Port State Control: | None | |
| Any outstanding deficiencies as reported by any Port State Control? | N.A | |
| If yes, provide details: | N.A | |
| **FOR USA CALLS ONLY** | | |
| Qualified individual (QI) - Full Style: | N.A | |
| Oil Spill Response Organization (OSRO) -Full Style: | N.A | |
| Has owner, manager, or operator signed the Sea Carrier Initiative agreement with US customs concerning drug smuggling? | N.A   Yes   No | |

Revised: Jan.2008 (INTERTANKO.com / Q88.com)

# ROBERTO DIP DECL.


# EXHIBIT 2

# Oram Marine Co Ltd

#801, Leema Bldg. 146-1, Susong-dong,
Chongro-ku, Seoul, Korea 110-755
Tel        : (82 2) 398 5984
Fax        : (82 2) 398-5969
E-mail     : oram@oramtanker.com

## FREIGHT INVOICE

| | |
|---|---|
| TO | : BAUCHE ENERGY SA, NYON, SWITZERLAND |
| CC | : POLE SHIPPING GENEVA |
| INVOICE NO | : ORBL-F003-2 |
| DATE | : 09TH JUNE, 2008 |

**ORIGINAL**

| DESCRIPTION | AMOUNT |
|---|---|
| Vessel          : M/T ORAM BLOSSOM V.003B | |
| B/L Date         : 08TH JUNE, 2008 | |
| Cargo            : 2,348.916MT OF ETHANOL | |
| Loading Port     : KARACHI, PAKISTAN | |
| Discharging Port : ULSAN, KOREA | |
| | |
| Freight | |
| O/F              :  2348.916 MT  X  USD 90       PMT | US$ 211,402.44 |
| | |
| SAY              : US Dollars Two Hundreds Eleven Thousand | |
|                    Four Hundreds Two And Cents Four Four. | |

PLEASE REMIT THE ABOVE AMOUNT TO :          TOTAL    US$211,402.44

| | |
|---|---|
| KOREA EXCHANGE BANK    (SWIFT: KOEXKRSE) | |
| BRANCH               ; SEODAEMUN | |
| ACCOUNT NO.          ; 630-006485-917 | |
| BENEFICIARY          : ORAM MARINE CO LTD | |

ORAM MARINE CO LTD

# ROBERTO DIP DECL.


# EXHIBIT 3

# POLE SHIPPING S.A.

26, rue Adrien-Lachenal
CH-1207 GENEVA
Switzerland
Phone    +41 22 707 97 97
Fax       +41 22 700 48 58
e-mail: info@poleshipping.ch
www.poleshipping.com

Messrs.
**BAUCHE ENERGY**
6, Av Reverdil
1260    NYON

Attn:    Mr Ricardo PARADA

Reference    : ORBL-F003-2

Geneva, 09th June 2008/BC

## FREIGHT INVOICE
### In the name and on behalf of ORAM MARINE

Account        : BAUCHE ENERGY

Vessel name   : M/T ORAM BLOSSOM
Voyage        : KARACHI - ULSAN
CP date       :    30.05.2008
B/L date      :    08.06.2008
Cargo         :    2'348.916 MTS of ETHANOL
Freight rate  :      90.00 USD/PMT                        USD    211'402.44

                                            Sub total     USD    211'402.44

Deductions    :      2.50% Brokerage commission           USD      5'285.06

                                  Net due to Owners   USD    206'117.38

Remittance details :
Bank          : KOREA EXCHANGE BANK, SEODAEMUN BRANCH
Swift         : KOEXKRSE
Account N°    : 650-006485-917
In favour of  : ORAM MARINE CO., LTD.
Refs          : ORBL-F003-2   ORAM BLOSSOM





# POLE SHIPPING S.A.

26, rue Adrien-Lachenal
CH-1207 GENEVA
Switzerland
Phone     +41 22 707 97 97
Fax       +41 22 700 48 58
e-mail: info@poleshipping.ch
www.poleshipping.com

Messrs.
**BAUCHE ENERGY**
6, Av Reverdil
1260     NYON

**V.A.T. #**      : 328575
**Invoice #**     : 680/5526

Attn:    Mr Ricardo PARADA

Geneva, 09th June 2008/BC

## COMMISSION INVOICE
### In the name and on behalf of ORAM MARINE

Account          : BAUCHE ENERGY

Vessel name      : M/T ORAM BLOSSOM
Voyage           : KARACHI - ULSAN
CP date          : 30.05.2008
B/L date         : 08.06.2008
Cargo            : 2'348.916  MTS of ETHANOL
Freight rate     :     90.00  USD/MTS
Total Freight due : 211'402.44  USD

Commission       :     2.50%   Brokerage to Pole Shipping

USD     5'285.06
To your debit
Swiss VAT Zero rated

Remittance details :
Bank             : Banque Cantonale de Geneve, Geneve
                   Quai de l'Ile 17 - POB 2251 - 1211 Geneva 2
IBAN             CH57 0078 8000 U321 6609 2  USD
Swift            : BCGECHGG
In favour of     : Pole Shipping S.A. - Geneva
Refs             : Invoice # 680/5526 / M/T ORAM BLOSSOM





# POLE SHIPPING S.A.

26, rue Adrien-Lachenal
CH-1207 GENEVA
Switzerland
Phone    +41 22 707 97 97
Fax      +41 22 700 48 58
e-mail: info@poleshipping.ch
www.poleshipping.com

Messrs.
**BAUCHE ENERGY**
6, Av Reverdil
1260    NYON

MT0146

Attn:    Mr Ricardo PARADA

Reference    : **ORBL-F003-2**          Geneva, 09th June 2008/BC

## FREIGHT INVOICE
### In the name and on behalf of **ORAM TANKERS**

| | | | | |
|---|---|---|---|---|
| Account | : BAUCHE ENERGY | | | |
| Vessel name | : M/T ORAM BLOSSOM | | | |
| Voyage | : KARACHI - ULSAN | | | |
| CP date | : 30.05.2008 | | | |
| B/L date | : 08.06.2008 | | | |
| Cargo | : 2'348.916 MTS of ETHANOL | | | |
| Freight rate | : 90.00 USD/PMT | | USD | 211'402.44 |
| | | Sub total | USD | 211'402.44 |
| Deductions | : 2.50% Brokerage commission | | USD | 5'285.06 |
| | | Net due to Owners | USD | 206'117.38 |

Remittance details :
Bank          : KOREA EXCHANGE BANK, SEODAEMUN BRANCH
Swift         : KOEXKRSE
Account N°     : 650-006485-917
In favour of  : ORAM MARINE CO., LTD.
Refs          : ORBL-F003-2   ORAM BLOSSOM





# ROBERTO DIP DECL.

# EXHIBIT 4

Message MT 103

Created 12.06.2008 15:09:36  Status : K Acknowledged received (ACK : 12/06/2008 15:10)  Addressee : KOEXKRSEXXX KOREA EXCHANGE BANK

| Tag | Field Name | Content |
|---|---|---|
| 20 | SENDER REFERENCE | TR017101610X1100 |
| 23B | BANK OPERATION CODE | CRED |
| 32A | VALUE DATE, CURR., AMOUNT | 080612 |
| | | USD |
| | | 206117,38 |
| 33B | CURRENCY/INSTRUCTED AMOUNT | USD |
| | | 206117,38 |
| 50K | INSTRUCTING PARTY | /CH42086860010847141001/1710161 0 |
| | | BAUCHE ENERGY SA |
| | | 6, AVENUE REVERDIL |
| | | NYONI/CH |
| 53A | SENDER' S CORRESPONDENT | BNPA |
| | | US |
| | | 3N |
| 54A | RECEIVER' S CORRESPONDENT | BKTR |
| | | US |
| | | 33 |
| 59 | BENEFICIARY | /6500064859 17 |
| | | ORAM TANKERS LTD |
| | | KOREA//KR |

THIS IS NOT A STATEMENT OF ACCOUNT. THIS IS AN INTERNAL DOCUMENT FOR YOUR INFORMATION ONLY, WITHOUT ANY COMMITMENT FOR THE BANK

70
71A

REMITTANCE INFORMATION
DETAILS OF CHARGES

ORBL F003-2
SHA

THIS IS NOT A STATEMENT OF ACCOUNT. THIS IS AN INTERNAL DOCUMENT FOR YOUR INFORMATION ONLY, WITHOUT ANY COMMITMENT FOR THE BANK

# ROBERTO DIP DECL.


# EXHIBIT 5

**Roberto Dip**

| From: | Roberto Dip |
| --- | --- |
| Sent: | vendredi, 13. juin 2008 10:06 |
| To: | 'daniel.r.renaud@bnpparibas.com' |
| Cc: | Walter Becker |
| Subject: | FW: ORAM BLOSSOM - FREIGHT - URGENT |

Attachments:      exportSwift[1].pdf



exportSwift[1].pdf
(3 KB)

Daniel,

As for the payment yesterday, we need to amend the beneficiary name:
Oram Marine Co Ltd" instead of "Oram Tankers Ltd".

Could you please help me with this issue?

Regards,

Roberto Dip
Bauche Energy
+41 22 994 2915 (phone)
+ 41 -22 9942929 (fax)


-----Original Message-----
From: chems@poleshipping.ch [mailto:chems@poleshipping.ch]
Sent: vendredi, 13. juin 2008 09:49
To: mail.br@bauche-energy.com
Subject: FW: ORAM BLOSSOM - FREIGHT - URGENT

Doc-No. 1604850  13/JUN/2008  09:48 (UTC +0200) BC

TO: BAUCHE                      ATT: RICARDO - NELSON - FILIPE -
WALTER

RE: ORAM BLOSSOM - FREIGHT - URGENT


GOOD MORNING!

FURTHER TO TELCON WITH WALTER OF A FEW MINUTES AGO, PLEASE NOTE BELOW
MESSAGE, RECEIVED OVERNIGHT FROM OWNERS:

QUOTE
Received bank swift well with thanks and confirm the funds have received
in our bank account.

The fund, However, cannot be drawn from our Bank because there is a
conflict between bank account number and beneficiary name.

Our bank accout nbr. 650-006485-917
Beneficiary name : Oram Marine Co Ltd

1

But we had indicated "Oram Tankers Ltd" as a beneficiary name. That's why we cannot draw the funds from Bank. You are, therefore, kindly requested to amend beneficiary name as "Oram Marine Co Ltd" instead of "Oram Tankers Ltd".
UNQUOTE


PLEASE ACT PROMPTLY.


AWAITING YOUR NEWS,

THANKS AND KIND REGARDS,

BETH CARVALHO
POLE SHIPPING/OPS
TEL: +41-22-707-9797
FAX: +41-22-700-4858
E-MAIL: chems@poleshipping.ch
WEB: www.poleshipping.ch
YAHOO ID: bethwink2008

# ROBERTO DIP DECL.


# EXHIBIT 6

**Roberto Dip**

| | |
|---|---|
| **From:** | daniel.r.renaud@bnpparibas.com |
| **Sent:** | vendredi, 13. juin 2008 11:44 |
| **To:** | Roberto Dip |
| **Subject:** | Re: FW: ORAM BLOSSOM - FREIGHT - URGENT |

Dear Roberto,

We have a problem with your payment of USD 206'117.38 in fav. Oram Tankers Ltd..
Effectively, we received a 'maritime attachment' which you can read below.

We are contacting our legal department in order to settle this situation.
Please let us have any informations which can be helpful for us.
We keep us in contact.
Best regards
Daniel Renaud

QUOTE

**FROM : BNP PARIBAS SA**
**NEW YORK US**

**TO   : BNP PARIBAS (SUISSE) SA**
**FAX  : +41.(0)58.212.22.22**
**TELEX : 412100 BNP CH**
**SWIFT : BPPBCHGGXXX**
**GENEVE CH**

**DATE : 13/06/2008**

**MTN99 : FREE FORMAT MESSAGE**
**(20 ) TRANSACTION REF. NB.    PAY0612082R20701**
**(79 ) NARRATIVE**
**ATTN. CUSTOMER SERVICES**
**RE YR MT202 FOR USD206,117.38 VALUE 080612**
**YOUR REF TR017101610X2200 REF. B/O BAUCHE ENERGY**
**BNF ORAM TANKERS LTD.**
**.**
**PLEASE BE ADVISED BNP PARIBAS IS HOLDING THE FUNDS**
**DUE TO A PROCESS OF MARITIME ATTACHMENT AND**
**GARNISHMENT SERVED ON THE BANK TODAY, JUNE 12 2008**
**PLEASE CONTACT ATTORNEY FOR THE PLAINTIFF, JEANNE**
**MARIE VAN HEMMEN IN THE CASE ENTITLED, KTB OIL**
**CORPORATION V. ORAM TANKER LTD. REFERENCE CASE NUM**
**BER 08 CV 00584, (212)297-0050, BETANCOURT, VAN HE**
**MMEN, GRECO   KENYON LLC.**
**REGARDS,**
**NY PAYMENT SERVICES**
**(-) END OF MESSAGE**

24.06.2008

# ROBERTO DIP DECL.

# EXHIBIT 7

n: 41 227004840     Page: 1/2     Date: 25.07.2007 11:...:47

# P⊕LE SHIPPING S.A.

26, rue Adrien-Lachenal
CH-1207 GENEVA
Switzerland
Phone     +41 22 707 97 97
Fax       +41 22 700 48 58
e-mail: info@poleshipping.ch
www.poleshipping.com

Messrs.
**BAUCHE ENERGY**
6, Av du Reverdil
1260 Nyon

Attn:     MR. Ricardo Parada

Reference     : ORZH-003A                    Geneva, 25th July 2007

### FREIGHT INVOICE
### In the name and on behalf of ORAM TANKERS LTD

| | | | |
|---|---|---|---|
| **Account** | : BAUCHE ENERGY SA | | |
| **Vessel name** | : M/T ZHONG HUA 7 | | |
| **Voyage** | : KARACHI - ULSAN | | |
| **CP date** | : 01.06.2007 | | |
| **B/L date** | : 25.07.2007 | | |
| **Total Cargo** | : 4'885.141 MTS of ETHANOL | | |
| **Freight Rate** | : 78.00 USD/MT | USD | 381'041.00 |
| **Commission** | : 2.50% Brokerage to Pole Shipping | USD | 9'526.02 |
| | Net due to Owners | USD | 371'514.97 |





Remittance details :
Bank           : HANA BANK
Branch         : SOGONG DONG
Account        : 195-910003-05232
Swift          : HNBNKRSE
In favour of   : ORAM TANKERS LTD
Refs           : invoice # ORZH-003A

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977



CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

### PREAMBLE

GENEVA, 1st JUNE 2007

Place                              Date

IT IS THIS DAY AGREED between **ORAM TANKER LTD**
~~chartered owner~~/owner (hereinafter called the "Owner") of the **PANAMA FLAG**
~~SS/MS~~ **M/T ZHONG HUA 7** (hereinafter called the "Vessel")
and **BAUCHE ENERGY SA** (hereinafter called the "Charterer")
that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party,
which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over
those contained in Part II.

### PART I

A.      Description and Position of Vessel:

   Deadweight: **9'013.18** tons (2240 lbs.)     Classed: **N. K. K.**
   Loaded draft of Vessel on assigned summer freeboard **7.617** ~~ft.~~ **MTRS** in. in salt water.
   Capacity for cargo: **9'568 CBM INCLUDING SLOPS** ~~tons (of 2240 lbs. each)~~ **98** % more or less, Vessel's
option.

   Coated:            [ ] Yes       [X] No **STAINLESS STEEL**
   Coiled:            [ ] Yes       [ ] No         last **THREE** ~~two~~ cargoes: **PALMS OILS**
   Now: **TRADING** Expected Ready:

B.      Laydays:

   Commencing: **25TH JUNE 2007**      Cancelling: **05TH JULY 2007**

C.      Loading Port(s): **ONE SAFE CHARTERER'S BERTH KARACHI**

~~Charterer's Option~~

D.      Discharging Port(s): **ONE SAFE CHARTERER'S BERTH ULSAN**

~~Charterer's Option~~

E.      Cargo: **5'000 MTS 5% MORE OR LESS IN CHARTERERS OPTION, 1 – 3 GRADES POTABLE
         ETHANOL IN BULK WITHIN VESSEL NATURAL SEGREGATION ( INTENDED BREAKBOWN
         23/2400 MT + 1500 MTS + 12/1100 MTS, SG AROUND 0.8100/CBM ).**

~~Charterer's Option~~

F.      Freight Rate: **USD 78.-** per ton (of 2240 lbs. each).

G.      Freight Payable ~~to~~: **7 WORKING DAYS AFTER SIGNING RELEASING B/L'S** ~~at~~

H.      Total Laytime ~~in Running Hours~~: **125/150 MTPH SHINC REVERSIBLE**

I.      Demurrage per day: **USD 11'000.- PRO RATA**

J.      Commission of **2.5** % is payable by Owner to **POLE SHIPPING SA**

   on the actual amount freight, **DEADFREIGHT AND DEMURRAGE** when and as freight is paid.

K.    The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.    Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.    Special Provisions:

**M1.  OWNERS AGENT AT BOTH ENDS.**

**M2.  SURVEYORS TO BE ARRANGED BY CHARTERERS AT THEIR OWN ACCOUNT.**

**M3  CHARTERERS TO RETURN ORIGNAL B/L, WHICH IS ENDORSED BY CONSIGNEE, TO OWNERS WITHIN 20 DAYS AFTER COMPLETION OF DISCHARGE.**

**M4.  THE CERTIFICATE SHALL NOT BE LIABLE FOR SHORTAGE UP TO 0.5% OF ENTIRE CARGO.**

**M5  IF ANY, ALL TIME/ COST/ARRANGEMENT OF PRE-WASH/DISPOSAL FOR CHARTERER'S ACCOUNT.**

**M6.  VESSEL DESCRIPTION, AS ATTACHED.**

**M7.  BAUCHE CHARTERING TERMS 1 TO 28, AS ATTACHED.**

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of: **THE OWNERS**

By: _____

Witness the signature of:  **THE CHARTERERS**

By: _____
BAUCHE ENERGY SA
6 Avenue Reverdil
1260 NYON

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.